# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JON ZELLER,                              )
                                         )
      Plaintiff,                  )
                                         )
   vs.                                   )      **Case No. 4:05CV316MLM**
                                         )
JO ANNE B. BARNHART,                     )
Commissioner of Social Security,         )
                                         )
      Defendant.                  )

## MEMORANDUM OPINION

This is an action brought pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne Barnhart ("Defendant") denying the application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., filed by Jon Zeller ("Plaintiff"). [1] Plaintiff has filed a Brief in Support of the Complaint. [13] Defendant has filed a Brief in Support of the Answer. [15] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). [6]

## I.
## PROCEDURAL HISTORY

On July 15, 2002, Plaintiff filed an application for SSI pursuant to Title XVI of the Act alleging a disability onset date of May 15, 1998.[1] (Tr. 63-65, 84). The application was denied. (Tr. 53-56). Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Jan Donsbach on June 9, 2004. (Tr. 35-51). The ALJ found that Plaintiff was not disabled at anytime though the date of the decision, July 7, 2004. (Tr. 20). Plaintiff filed a timely request for review with

---

[1] Petitioner previously filed an application for benefits which application was denied on June 26, 1997. (Tr. 84).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the Appeals Council which denied Plaintiff's request on December 21, 2004. (Tr. 4-6). In denying the Plaintiff's request for review, the decision of the ALJ became the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that he worked as a delivery truck driver for two months in the summer of 2003 and that stopped working because he could not lift. He further testified that he could not work due to bulging discs which caused him to have headaches and pain in his back, legs, and feet; that this pain is constant; and that he has headaches daily. (Tr. 38-40). Plaintiff also testified that he has diabetes, sleep apnea, and RSD; that he has numbness in his hands with the right hand's being worse; that this numbness makes it difficult for him to pick up small items; and that he can stand for ten minutes at a time and that he can sit indefinitely. (Tr. 41, 43).

Plaintiff further testified that he takes medication for his symptoms; that this medication helps; and that it makes him drowsy. (Tr. 40, 45). He said that during the day he watches movies; that he washes dishes; that he drives when he needs to go somewhere; that he takes a one to two hour nap each afternoon; and that he spends sixteen hours trying to get six hours of sleep. (42-43).

Plaintiff also testified that he has difficulty picking up things and that if he sits at the computer for any amount of time his right hand goes numb. (Tr. 45). He said that several years prior to the hearing he gained 100 pounds in a one year period. (Tr. 46).

A Vocational Expert also testified at the hearing. The court will address the relevant content of the Vocational Expert's testimony below.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

# MEDICAL RECORDS

Garry L. Carls, M.D., reported on November 2, 1998, that his impression of Plaintiff's cervical spine was that Plaintiff had narrowing with degenerative change at C5-6 and no acute osseous abnormality. (Tr. 119).

A radiologist reported on November 5, 1998, that the impression from an MRI of Plaintiff's cervical spine was "spondylosis with asymmetric left sided hard and soft disc C5-6" and "smaller defuse defect C6-7." (Tr. 120).

In a letter dated August 2, 2001, George Schoedinger, III, M.D., reported that Plaintiff was seen on August 2, 2001, and that on that date Plaintiff reported that he was not working; that he was smoking one pack of cigarettes a day; that he had no sensory loss in his upper limbs; and that he "developed a 'flare-up' of pain about his neck associated with pain radiating into his left shoulder and upper arm." Dr. Schoedinger's letter of this date further states that upon examination Plaintiff was obese at 306 pounds and that his range of motion was decreased on all planes. Dr. Schoedinger opined that Plaintiff had reached maximum medical improvement given the length of time since his injury. He further reported that he told Plaintiff that weight loss was essential to his well being, that he told Plaintiff that he must discontinue use of tobacco products, and that he referred Plaintiff to a pain management specialist, Gurpreet S. Padda, M.D. (Tr. 103).

Records of Dr. Padda reflect that this doctor saw Plaintiff on August 10, 2001. Dr. Padda reported on this date that Plaintiff had significant pain; that Plaintiff had not had cervical surgery due to his morbid obesity; and that there was a likelihood that Plaintiff would not have long term relief without control of his weight. Dr. Padda's notes further state that Plaintiff had gained fifty pounds since an injury in May 1998; that Plaintiff's parasthesias were markedly reduced; that he had

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

intermittent disc dysesthesia; and that there was evidence suggesting significant facet disease and central spinal cord neural foraminal narrowing. (Tr. 101).

Dr. Padda's notes of August 17, 2001, state that Plaintiff had been referred to the Pain Center with a history of C5-6 herniated nucleus pulposus, C6-7 diffuse disc bulge on the left side and cervicalgia trapezius hyperspasm, deltoid hyperspasm, C6-7 distribution radicular symptoms and intermittent decreasing sensation in a C8 dermatomal pattern. Dr. Padda's notes of this date further state that Plaintiff had "persistent cerbicalgia, despite conservative therapy including physical therapy and rest"; that Plaintiff had a epidural steroid injection on August 10, 2001 which reduced Plaintiff's pain by approximately 50% to 60% for approximately one week, and reduced his pain during that one week for two days by 100%"; and that as of August 17, 2001, Plaintiff had "about 50% of his original pain." (Tr. 99). Dr. Padda's notes further state that the plan was for Plaintiff to have a second epidural steroid injection. Dr. Padda also recommended on this date that Plaintiff have "an alpha-stim for paraspinous and trapezius hyperspasticity." (Tr. 99).

Records of Hafiz Khattak, M.D., reflect that Plaintiff was seen on December 13, 2001. Dr. Khattak's clinical findings on this date were tingling and parathesias in the bilateral upper extremities. He further reported that an electrodiagnostic study of the bilateral extremities was normal. (Tr. 96).

Gregory R. Cizak, M.D., stated in an MRI report dated March 7, 2002, that his impression was that Plaintiff had degenerative disc changes at L4-5 without herniation or stenosis. (Tr. 104).

Dr. Padda's records dated May 16, 2002, state that Plaintiff had undergone steroid injections and cervical facet injections with good resolution of symptoms; that an MRI demonstrated an L4-5 herniated nucleus pulposus with disc bulge; that Plaintiff continued to have some improvement; that Plaintiff had persistent positive bilateral lower extremities straight leg raise at less that sixty degrees;

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that a third steroid injection and significant weight loss were recommended; and that a diskography and nucleoplasty were recommended if Plaintiff's symptoms persisted. (Tr. 95).

An operative note from SouthPointe Hospital, dated December 2, 2002, states that Plaintiff's pre and post operative diagnoses included herniated disc, low back pain, and lumbar radiculpathy. Notes of this date further state that Dr. Padda performed a "four level evocative diskography with flouroscopic guidance" and that there were no complications. (Tr. 93-94). Medical records further reflect that a CT scan of Plaintiff's lumbosacral spine conducted on this date showed right paracentral disc protrusion at L3-4 with comprization of the anterior dural sac; that there was no evidence of fracture; and that the images were compromised because of obesity. (Tr. 89).

Ravi Mehra, M.D., reported on February 3, 2003, that Plaintiff was seen for a check up for hypertension and diabetes and that he was doing better. Dr. Mehra records further reflect that Plaintiff was seen from June 11, 2001, through February 10, 2003, for checkups and medication refills. (Tr. 107-114). In particular, Plaintiff was prescribed Vicodin on February 4, 2003; that a prescription for Ambien was refilled on March 5, 2003; and that on February 7, 2003, Plaintiff reported that medications were not helping with his back, legs, knees, and neck and that he was miserable. (Tr. 107).

Saul D. Silvermintz, M.D., reported that Plaintiff was seen for an internal medicine evaluation on April 22, 2003. Dr. Silvermintz's report states that Plaintiff's chief complaints were diabetes, ruptured disc, and hypertension. This report further states that Plaintiff was thought to be a diabetic several months earlier; that he was checked by his doctor; that Plaintiff had been checking his sugars; that they ran in the "80's and 90's"; and that Plaintiff has had no problems and "feels good." Dr. Silvermintz's report further states that Plaintiff said he had two ruptured discs in his lumbar spine and two ruptured discs in his neck; that he was told that his back pain would not be helped by surgery;

5

that his current medications were not helping his pain as much as his previous medications; and that his doctor would not give his previous mediation, Flexeril. The report further states that Plaintiff said he smoked a pack of cigarettes a day. (Tr. 125-26).

Dr. Silvermintz's report also states that Plaintiff was seventy-one inches tall; that he weighed 308 pounds; that two months earlier he weighed 314; that his blood pressure was 102/64; that Plaintiff was morbidly obese and in no acute distress; that his lungs were clear to percussion and auscultation; that Plaintiff's extremities were without malformations, swelling, edema or erythema; that Plaintiff had no difficulties with any of his extremities with full range of motion and normal gait; that Plaintiff could pick up things; and that Plaintiff's muscle strength was "normal bilaterally at 5/5"; that Plaintiff's reflexes were "intact, 2+ bilaterally." Dr. Silvermintz's impression was that Plaintiff was morbidly obese; that his hypertension was controlled with no evidence of end organ damage; that Plaintiff had diabetes mellitus type 2 with no evidence of end organ damage; that Plaintiff had a history of cervical discs with slight limitation of range of motion; and that Plaintiff had a "history of lumbosacral disc, no positive findings." (Tr. 127).

Medical records dated April 25, 2003, reflect that Plaintiff's blood pressure was 128/84; that his gait, digits, joints, muscle strength and tone, and stability were normal; that his cranial nerves were normal; that his neck was supple; that his general appearance was normal; that the was overweight. (Tr. 169).

Dana Armstrong, R.N., B.C., A.P.N., prepared a "follow-up consult report" dated May 23, 2003. Nurse Armstrong reported on this date that Plaintiff's physical examination was within normal limits; that his blood pressure was 143/91; that he had normal gait and station; that he did have pain to palpitation of his thoracic spine; that he had decreased range of motion of flexion, extension and lateral flexion of his lumbar spine; and that he had full range of motion of bilateral lower extremities.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Nurse Armstrong reported that her impression included low back pain, lumbar radiculopathy, bilateral L5/S1, and thoracic myofacial pain. Nurse Armstrong reported that the plan was for Plaintiff to continue his current pain medications and that he would discontinue Ultram. She noted that Plaintiff did not want any further intervention; that Plaintiff said he was going to take his ex-wife's Vicodin; and that this was a violation of his narcotic contract. (Tr. 132).

Nurse Armstrong reported that Plaintiff was examined on July 29, 2003; that his physical exam was within normal limits; that he had normal gait and station; that he had full range of motion of his lumbar spine and bilateral lower extremities; that her impression included low back pain, degenerative disc disease, and lumbar radiculopathy, that Plaintiff's current medications were "not covering break-through pain"; that the plan was to discharge Plaintiff from the Center for Pain Management because it was unable to do any further medical intervention for Plaintiff's pain at that time; and that Plaintiff was to be referred to another pain clinic. (Tr. 184).

Medical notations of September 11, 2003, are only somewhat legible and state that Plaintiff had a skin abscesses; that he had pain in his feet and shoulder; that Plaintiff's diabetes was diet controlled; that Plaintiff was obese and did not exercise at all; that he had not exercised since a knee operation; that Plaintiff had cigarette abuse; and that Dr. Padda no longer saw Plaintiff because he no longer took Plaintiff's insurance. Plaintiff's interpretation of notations of this date is that these notations also state that Plaintiff had degenerative disc disease after an accident in 1998; that Plaintiff was trying to get disability; and that Plaintiff had a history of hypertension, thyroid condition, increased lipids, chronic pain symptoms, sleep apnea, and rheumatoid arthritis in remission. (Tr. 186-87).

Medical notations of October 9, 2003, state that Plaintiff's chest was clear and that he was willing to try Wellbutrin and a patch for smoking. (Tr. 188). Medical notations of November 6, 2003,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

state either that Plaintiff had no complaints or no new complaints[2] and no lightheadedness; that he did not buy a nicotine patch; that he was still smoking; that his chronic pain was under control; and that Plaintiff was "euthymic." (Tr. 189).

Medical notations of December 2, 2003, state that Plaintiff reported that he was working two jobs; that he was delivering newspapers; and that he lost twenty pounds. Notes of this date further state that Plaintiff had sweating and hypertension. (Tr. 190).

Medical notations of December 29, 2003, state that Plaintiff was still smoking; that he reported that he "feels OK" and that he had no more cold sweats; that he was "euthymic"; that Plaintiff's sweating was no longer a problem; that Plaintiff had weight loss with conscious dieting; that he weighed 290 pounds; that his blood pressure was 138/78; that Plaintiff reported that he was more active; and that his high blood pressure was not fully blocked. (Tr. 191).

Medical notations of January 26, 2004, state that Plaintiff was "doing well"; that his pain was "well controlled"; that he had no lightheadedness; that his chest was clear; that his blood pressure had decreased from 138 to 130 since his last visit; that it may be more like 120; and that Plaintiff would continue his present medications. (Tr. 192). Medical notations dated February 19, 2004, state that Plaintiff had "no c/o's"; that Plaintiff's blood pressure was 115/80; and that his blood pressure was well controlled. (Tr. 193). Medical notations dated March 18, 2004, state that Plaintiff had "no c/o's"; that Plaintiff was excited because he had just flown to "S. Il & back"; that Plaintiff's blood pressure was 190/100; and that he had no dizziness or lightheadedness. (Tr. 194). Medical notations of April 15, 2004, state that Plaintiff had "no c/o's"; that he was working out three times a week at a gym; that he had reflex sympathetic dystrophy ("RSD"); that there was "no root cause" for the

---

[2]    Plaintiff states that notes of November 6, 2003, state that Plaintiff had no new complaints. Defendant states that notes state that Plaintiff had no complaints. Notations actually state "no c/o's." (Tr. 189).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

RDS; that Ambien was prescribed for insomnia; and that Plaintiff's hypertension was controlled and not yet optimal. (Tr. 195).

## IV.
## THE ALJ'S DECISION

The ALJ considered that Plaintiff was thirty-nine years old and that he alleged disability since March 15, 1998, due to diabetes, degenerative disc disease of the lumbar and cervical spine, sleep apnea, and reflex sympathetic dystrophy in the right lower leg and foot. The ALJ further considered Plaintiff's past work and that he had unsuccessful work attempts. The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. The ALJ concluded that Plaintiff could not perform his past relevant work and that there were other jobs which he is capable of performing. (Tr. 15-16).

The ALJ considered Plaintiff's testimony at the hearing, the medical records, Plaintiff's subjective complaints, and the testimony of the VE and concluded that Plaintiff is capable of performing a significant range of light work and that, therefore, he is not disabled. (Tr. 16-19).

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations.

9

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. § § 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that the at Step 5 the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

11

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. 42 U.S.C. § 423(d)(1); Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993); Roach v. Sullivan, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 849 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 426 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

perform his or her past relevant work can perform other work which exists in the national economy.

Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

## VI.
## DISCUSSION

As stated above, the issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff is engaged in substantial gainful activity and, therefore, is not disabled. Onstead, 962 F.2d at 804. The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (9th Cir. 1991). Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff argues that the ALJ improperly found that Plaintiff's RSD and obesity were not severe impairments; that the ALJ's credibility determinations were not properly made pursuant to Polaski; that the ALJ did not pose a proper hypothetical to the vocational expert; and that the ALJ's determination of Plaintiff's RFC was not proper.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**A.    ALJ's Findings that Plaintiff's Obesity and RSD were not Severe:**

Plaintiff argues that the ALJ incorrectly found that Plaintiff's obesity[3] and RSD were not

---

[3]    20 C.F.R., Pt. 404, Subpt. P, App. 1, I, states that when determining "whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."

Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002), states, in relevant part, that:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat.  Obesity is generally a combination of factors (e.g., genetic, environmental, and behavioral).  .  .  .

We will consider obesity in determining whether:
The individual has a medically determinable impairment. . . .
The individual's impairment(s) is severe. . . .
The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . .
The individual's impairment(s) prevents him or her from doing past relevant work. . . .

If an individual has the medically determinable impairment obesity that is "severe" as described  [above], we may find that the obesity medically equals a listing. . . . We may find in a title II claim, or an adult claim under title XVI, that the obesity results in  a finding that the individual is disabled based on his or residual functional capacity (RFC), age, education, and past work experience. However, we will also consider the possibility of coexisting or related conditions, especially as the level of obesity increases.  .  .  .

There is no specific weight or BAI that equates with a "severe" or a "not severe" impairment.  . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe.  . . .

Because there is no listing for obesity, we will find that an individual with obesity may meet the requirements of a listing if he or she has another impairment that, by itself, "meets" the requirements of a listing.  We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.  For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.

15

severe. First, the court notes that Plaintiff did not allege in his application for disability benefits that he is disabled due to obesity or RSD. Rather, he alleged he is disabled due to diabetes, hypertension, and four ruptured discs. (Tr. 53, 77). When asked by the ALJ why he is allegedly unable to work Plaintiff responded that he unable to work because of a bulging or ruptured disc and stated that his symptoms include daily headaches, pain in his back going into both his feet, and an inability to stand more than ten minutes. (Tr. 39). When further questioned as to whether he has other problems Plaintiff responded that he is a diabetic, that he has sleep apnea, and that he has reflex sympathetic dystrophy ("RSD") in his right lower leg and foot area. (Tr. 40). Indeed, an ALJ is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993). As such, the ALJ did not err by failing to find that Plaintiff's obesity was a severe impairment as Plaintiff failed to alleged disability based on obesity either in his application for benefits or at the hearing. Moreover, the ALJ did find that Plaintiff has "severe" impairments which include diabetes, hypertension, degenerative disc disease of the lumbar and cervical spines, and hyperesthesia of the right foot and, as further set forth below, gave Plaintiff the benefit of the doubt in regard to his claim of pain radiating down into his foot.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to the claimant's age, education, or work experience. 20 C.F.R. § 416.920(c).[4] "An impairment imposes

_____

[4]       20 C.F.R. § 416.921 states:

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do

16

significant limitations when its effect on a claimant's ability to perform basic work is more than slight or minimal." Warren v. Shalala, 29 F.3d 1287, 1291 (8th Cir. 1994). "Basic work activities" encompass the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 416.921(b).

Prior to reaching his conclusion as to the severity of Plaintiff's conditions, the ALJ considered, among other things, that Plaintiff testified that he can stand only ten minutes, that he can sit probably indefinitely, and that he has to move around and re-adjust. The ALJ further considered that Plaintiff fell and injured himself in May 1998 when he slipped and fell at work; that he developed left-sided cervicalgia/cephalgia with multiple triggers; that the March 7, 2002 MRI revealed mild degenerative disc disease at L4-5 with no evidence of herniation or stenosis and no significant disc bulges in the remaining levels; and that a CT scan of December 2002 showed disc bulge with minimal compromise of the anterior dural sac. The ALJ further considered that Dr. Silvermintz reported that Plaintiff said he had low back pain which radiates to both sides and down his lower extremities; that Plaintiff had slight limitation in cervical spine extension and a ten degree deficit in cervical spine rotation; that

---

basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff's straight leg raising was negative bilaterally; that he had *full range of motion* of the extremities with no swelling, edema or erythema; that Plaintiff had *normal gait and was able to walk on heels and toes*; that Plaintiff had *no neurological deficits*; and that his impression included a history of cervical discs with slight limitation of range of motion and history of lumbosacral disc with no positive physical findings. The ALJ also considered records from the Center for Pain Management which state that Plaintiff was treated for low back pain which radiated to his lower extremities; that Plaintiff reported no significant improvement from treatment; that a physical examination of April 25, 2003, showed that Plaintiff had *normal gait, digits, joints, and muscles and full range of motion of the lumbar spine*; that an examination of May 23, 2003, showed only a slight limitation of motion of the lumbar spine and normal range of motion of the cervical spine; that on June 5, 2003, it was reported that Plaintiff had *normal range of motion of the cervical and lumbar spines*; that Plaintiff had *normal range of motion and neurological functioning* on July 29, 2003; and that Plaintiff was discharged from the clinic on July 29, 2003. (Tr. 17).

The ALJ also considered the notes from an unidentifiable source from September 11, 2003, to April 15, 2004; that these notes show generally that Plaintiff had no complaints; that notes from January 2004 state Plaintiff was *doing well* and that his *pain was well controlled*; that Plaintiff was diagnosed with RSD on April 15, 2004, with no root cause. (Tr. 17).

The ALJ also considered that the consultive examination showed no objective evidence of neuropathy or radiculopathy; that there was no evidence of hypertensive or diabetic end organ involvement; and that Plaintiff was diagnosed with RSD "but that the treating notes do not show symptoms consistent with RSD." (Tr. 18). The ALJ, however, gave Plaintiff "the benefit of the doubt" in regard to his testimony of pain radiation down his lower extremities. The ALJ factored this pain into his assessment of Plaintiff's RFC and concluded that Plaintiff could perform light exertional

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

work with the need to alternate sitting and standing according to need. Thus, the ALJ did find that Plaintiff's alleged pain in his lower extremities was limiting although he did not find, in particular, that Plaintiff's RSD was severe. Additionally, the ALJ did find that Plaintiff's hyperesthesia of the right foot was severe.

The ALJ did consider that Dr. Silvermintz reported that Plaintiff was seventy-one inches tall and weighed 308 pounds in April 2003. The ALJ further considered, as stated above, Dr. Silvermintz's report in regard to Plaintiff's range of motion, gait and walking. Additionally, although Dr. Silvermintz reported that Plaintiff was morbidly obese, he found that Plaintiff was in no acute distress as a result. Also, medical notations of December 2, 2003, state that Plaintiff reported that he was working two jobs and that he lost twenty pounds. The court further notes that medical notations of December 29, 2003, state that Plaintiff had weight loss with conscious dieting; that he weighed 190 pounds; that his blood pressure was 138/78; and that Plaintiff reported that he was more active. Significantly, the most recent medical notes state that as January 26, 2004, that Plaintiff was "doing well," that his pain was "well controlled,"that his blood pressure had decreased; notations of February 19, 2004, state that Plaintiff had no complaints and that his blood pressure was 115/80 and was well controlled; notations of March 18, 2004, state that Plaintiff had no complaints and that his blood pressure was 190/100; and notations of April 15, 2004, state that Plaintiff had no complaints and was working out three times a week.

As stated above, the ALJ was under no obligation to address Plaintiff's weight as Plaintiff did not allege disability due to obesity. To the extent it can be argued that the ALJ should have nonetheless addressed the effect of Plaintiff's weight on his ability to work and or its affect on his alleged disabling conditions, the court notes that the failure of the ALJ to specifically mention Plaintiff's alleged obesity other than the reference to Dr. Silvermintz's reporting that Plaintiff weighed

19

308 pounds in April 2003, can arguably be considered no more than a deficiency in decision writing. See Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995) (holding that an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) ("Although specific delineations of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require us to set aside a finding that is supported by substantial evidence.") (citing Carlson v. Chater, 74 F.3d 869 (8th Cir. 1996)).

Most significantly, Plaintiff's medical records do not reference that Plaintiff is limited in any way by his weight. Dr. Silvermintz is the only doctor who addressed any possible effect of Plaintiff's obesity and he concluded that Plaintiff was in no acute distress as a result of his obesity. Plaintiff's most recent medical records do not even reference his weight. Rather, these records clearly state that Plaintiff's blood pressure was under control,[5] that his pain was well controlled, that he was losing weight with dieting, that he was working, and that he was working out. As such, the court finds that the ALJ's finding in regard to the severity of Plaintiff's alleged impairments is supported by substantial evidence and is consistent with the Regulations and case law.

---

[5] In December 2003 Plaintiff's blood pressure was 134/84, 130/90, and 138/78 and in February 2004 it was 115/80. See Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992) (holding that a high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.00 C).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

## B.    Plaintiff's RFC:

Plaintiff contends that the ALJ's finding in regard to Plaintiff's RFC is not supported by substantial evidence. The ALJ found that Plaintiff has the RFC to perform a significant range of light work with the need to alternate sitting and standing according to need.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. In contrast to the first four steps of the sequential evaluation, in which the claimant carries the burden of proof, the Commissioner has the burden of establishing the claimant's RFC. See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Additionally, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. At step 4, "the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it." Id. At step 5, where a claimant's RFC is expressed in terms of exertional categories, it must also be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004), as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). Pursuant to this requirement, the ALJ in the matter under consideration considered that Plaintiff had no difficulty picking things up, that he had a slight limitation in range of motion of the cervical spine, and that he had normal range of motion of the lumbar spine. Additionally, the ALJ gave Plaintiff the benefit of the doubt in regard to Plaintiff's complaint of pain radiation down his lower extremities and found, therefore, that Plaintiff needs to alternate sitting and standing according to need. The ALJ found that Plaintiff's subjective complaints were not fully credible as there was no evidence of neuropathy or other abnormalities of the upper extremities to support his claim that he has difficulty with his arms and legs. He also considered other Polaski factors as set forth below in upon considering Plaintiff's credibility.

As stated above, the ALJ found that Plaintiff can engage in light work with the need to alternate sitting and standing according to need. Indeed, Plaintiff testified that he can stand for ten minutes and that he can sit indefinitely. The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 416.967(a). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6.

The court finds that the ALJ's conclusion that Plaintiff has the RFC to engage in light work with the stated limitations is consistent with his findings regarding the medical evidence and Plaintiff's credibility and that this finding is based on substantial evidence on the record. Moreover, the ALJ's determination of Plaintiff's RFC is consistent with the Regulations as it addresses his restrictions in terms of the requirements of light work. Additionally, the ALJ's assessment of Plaintiff's RFC is

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

based upon and is consistent with all of the relevant evidence. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).

## C.      Hypothetical Posed to the Vocational Expert:

Plaintiff alleges that the hypothetical posed to the VE was flawed as it did not capture the consequences of Plaintiff's impairments. Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of a claimant to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited  by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. Robinson, 956 F.2d at 839.  If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. Id.

SSR 83-10, 1983 WL 31251, at *1, clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

> [T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the

policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)

To increase the consistency and promote the uniformity with which disability determinations are made at this step at all levels of adjudication, the regulations for determining disability were expanded in February 1979. Appendix 2 was provided to establish specific numbered table rules for use in medical-vocational evaluation.

SSR 83-10, 1983 WL 31251, at * 6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." Id. at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." Id. at * 6, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

The Eighth Circuit has explained the circumstances when a claimant has nonexertional limitations but the ALJ need not resort to the testimony of a VE. The court held in Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

> "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349. "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir.1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

environmental restrictions." Id.; See 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992).

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995).

Additionally, an ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio, 862 F.2d at 180. The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question sets precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

The ALJ in the matter under consideration did not find that Plaintiff has non-exertional impairments and found that, based on his RFC, Plaintiff was able to perform the demands of a significant range of light work. As such, the ALJ was not required to utilize the testimony of a VE. See Reynolds, 82 F.3d at 258. The ALJ, nonetheless, chose to utilize a VE because he did find limitations on Plaintiff's ability to perform the full range of light work. The ALJ asked the VE if there was work available in the economy in the "light framework" with the need to alternate sitting and standing. (Tr. 49). This hypothetical encompassed Plaintiff's RFC as found by the ALJ. See Sobana, 879 F.2d at 445; Roberts, 783 F.2d at 112. The court has found above that the ALJ's determination of Plaintiff's RFC is based on substantial evidence. The court finds, therefore, that the hypothetical posed to the VE was proper and consistent with the Regulations and case law. See Reynolds, 82 F.3d at 258; Sobana, 879 F.2d at 445; Roberts, 783 F.2d at 112.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**D.** **Polaski factors**:

Plaintiff argues that the ALJ did not consider factors as established by Polaski, 739 F.2d at 1322, upon his choosing to discredit Plaintiff. As set forth more fully above, an ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. See Wheeler, 224 F.3d at 896 n.3; Reynolds, 82 F.3d at 258; Montgomery, 69 F.3d at 275. Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for ALJ to make. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Strongson, 361 F.3d at 1072. For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence:

First, the ALJ considered that Plaintiff's complaints of headaches, dizziness, and hypertension were infrequent and were controlled with medication, and that, therefore, these conditions are not disabling. As stated above medical records of November 2003 state that Plaintiff's pain was under control, notes of February 2004 clearly state that Plaintiff's blood pressure was well controlled, and notes of April 15, 2004, state that Plaintiff's blood pressure was controlled although not optimal. Conditions which can be controlled by treatment are not disabling. Harris v. Heckler, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985). See also Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Second, the ALJ considered that Plaintiff did not receive physical therapy, that he had no inpatient hospitalizations or emergency room care, and that he has not been referred to specialists for work-ups of his physical complaints. Failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain. Rautio, 862 F.2d at 179. Moreover, seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James, 870 F.2d at 450.

Third, the ALJ considered that Plaintiff was not fully compliant with his treatment as he took his ex-wife's Vicodin which violated his narcotic contract. A claimant's failure to comply with prescribed medical treatment is inconsistent with complaints of disabling pain. Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The court further notes that no physician placed restrictions on Plaintiff. A lack of significant medical restrictions is inconsistent with complaints of disabling pain. Id. at 964-65.

Plaintiff contends that his daily activities are not inconsistent with a determination that he is disabled and that the ALJ did not address his daily activities. The ALJ adequately explained and supported his credibility findings as discussed above. As such, his failure to specifically address Plaintiff's daily activities does not require that the court find that the ALJ's decision is not supported by substantial evidence. See Lowe, 226 F.3d at 972. Moreover, Plaintiff testified that he washes dishes and that he drives when he needs to go somewhere. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241

F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883).

The court finds that the ALJ's conclusion that Plaintiff's subjective complaints were not fully credible is adequately explained and that this conclusion is supported by substantial evidence on the record as a whole. See Strongson, 361 F.3d at 1072; Lowe, 226 F.3d at 972. As such, the court finds, contrary to Plaintiff's assertion, that the ALJ did properly consider factors as set forth in Polaski.

## VI.
## CONCLUSION

The Court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Brief in Support of Complaint is **DENIED**; [13]

**IT IS FURTHER ORDERED** that the relief sought by Defendant Jo Anne B. Barnhart in her Brief in Support of Answer is **GRANTED**; [15]

29

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

**IT IS FINALLY ORDERED** that a separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of July, 2005.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com